# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL GIGNAC, as he is the duly appointed Personal Representative of the Estate of LAURIE ANN GIGNAC and her heirs at law,<br><br>    Plaintiff,<br><br>vs.<br><br>CHRISTOPHER SANDERS, M.D. and ATTLEBORO INTERNAL MEDICINE, P.C.,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

On the right side, aligned with "vs.":

Civil Action No. _____
JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

**Now comes** Plaintiff Michael Gignac ("Plaintiff"), as he is Personal Representative of the Estate of Laurie Ann Gignac, and alleges as follows against Christopher Sanders, M.D. and Attleboro Internal Medicine, P.C. (collectively, the "Defendants"):

## PARTIES

1.   Plaintiff Michael Gignac ("Gignac") is an individual and a citizen of North Carolina. Plaintiff is the surviving spouse of Laurie Ann Gignac ("Decedent") and the duly appointed personal representative of Decedent's estate. Plaintiff brings this action on behalf of Decedent's Estate, on behalf of Decedent's wrongful death beneficiaries, including, without limitation: Ginac himself, Shenata Renee Clayborne (Decedent's daughter); Michael Allen Matthews (Decedent's son); and Shawn David Matthews (Decedent's son). Decedent was a citizen of Rhode Island or North Carolina at the time of her death, dividing her time between the two states.

2. Defendant Christopher Sanders, M.D. is an individual and a citizen of Massachusetts. He may be served with process at 10 Emory Street, Attleboro, MA 02703.

3. Attleboro Internal Medicine, P.C. is a professional corporation organized and existing under the laws of Massachusetts. It may be served by serving its registered agent, Pierce Mandel, at 11 Beacon Street, Suite 800, Boston, MA 02108-3021.

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and all of the defendants reside in this district.

## FACTS COMMON TO ALL COUNTS

5. This suit arises out of the wrongful death of Decedent, due to the wrongful conduct of the Defendants.

6. At all relevant times, Decedent was a patient receiving primary care and internal medicine professional services from Defendant Christopher Sanders, M.D.

7. Christopher Sanders, M.D., at all relevant times, has been a duly licensed medical doctor licensed in the Commonwealth of Massachusetts and specializing in internal medicine.

8. A doctor-patient relationship existed between Decedent, on the one hand, and Christopher Sanders, M.D., on the other hand. Therefore, Dr. Sanders owed an obligation of professional care to Decedent in connection with the medical care he provided to her. Dr. Sanders provided medical care to Decedent in his capacity as an employee or agent of Defendant Attleboro Internal Medicine, P.C.

9. Dr. Sanders treated Decedent from November 2007 until she died on January 22, 2010.

10. Dr. Sanders treated Decedent for a number of pain conditions, including, without limitation, migraine headaches, cervical disc disease, fibromyalgia, and a fractured rib.

11. Dr. Sanders gave Decedent a prescription for fentanyl transdermal system patches for pain. Decedent was instructed to wear two 100 mcg fentanyl patches for a total fentanyl dose of 200 mcg/hour. Decedent was using these patches (the "Gignac Patches") at the time of her death. Dr. Sanders also prescribed other medications for Decedent, including, without limitation, clonazepam, hydrocodone, seroquel, buprorion, metoprolol, stadol, oxycodone, and carbamazepine. The cause of Decedent's death was mixed drug toxicity.

12. A fentanyl patch (the "Patch") is a matrix patch containing the drug fentanyl. Fentanyl is an extremely dangerous drug that is at least 80 times more potent than morphine. Fentanyl is classified as a Schedule II controlled substance by the FDA and is generally used to relieve pain.

13. The Patch is applied by the patient and delivers fentanyl though the patient's skin.

14. Fentanyl patches come in 25, 50, 75, and 100 mcg/hour dosages. The largest dose of fentanyl available from a single fentanyl patch is 100 mcg/hour. Dr. Sanders prescription of 200 mcg/hour of fentanyl for Decedent was an extremely high dose of the most potent narcotic available for use by patients at home.

15. The companies that make the patch prepare an FDA-approved "Package Insert" that contains warning and instructions to doctors who prescribe the Patch.

16. The Package Insert for the Patch contains a "black box" warning to doctors stating that the Patch should not be given to patients for acute pain because doing so could cause

life-threatening hypoventilation. Shortly before Decedent's death, Dr. Sanders increased Decedent's dose of fentanyl to 200 mcg/hour at a time when Decedent was experiencing acute pain from a rib fracture (in addition to the normal pain caused by her disc disease and fibromyalgia). Increasing Decedent's fentanyl dose to 200 mcg/hour (an incredibly high dose) at a time when part of Decedent's pain was due to acute pain breached the standard of care and increased Decedent's risk of fatal respiratory depression.

17. The Package Insert for the Patches warns that fentanyl can cause life-threatening central nervous system ("CNS") depression and that the CNS effects of fentanyl increase with as a patient's blood fentanyl concentration increases. Dr. Sanders prescribed a 50 mcg/hour dose of fentanyl for Decedent in October 2009 and then proceeded to rapidly increase Decedent's fentanyl dose. By January 7, 2010, Dr. Sanders had quadrupled Decedent's fentanyl dose to 200 mcg/hour. Dr. Sanders breached the standard of care by rapidly increasing Decedent's fentanyl dose to such a high dose that it significantly increased Decedent's risk of fatal respiratory depression.

18. The Package Insert for the Patches contains a warning to doctors stating that the Patch should be used with caution in patients who are predisposed to hypoventilation. Decedent was predisposed to hypoventilation because she was a smoker. Dr. Sanders knew that Decedent was a smoker. Nevertheless, he still prescribed an extremely high dose of fentanyl and numerous other CNS-depressing medications for Decedent. In doing so, Dr. Sanders breached the standard of care and increased Decedent's risk of fatal respiratory depression.

19. The Package Insert for the Patches warns doctors that prescribing fentanyl with other central nervous system CNS depressants can cause respiratory depression. The Package Insert warns doctors that, if a doctor is contemplating combining fentanyl with other CNS-

depressing medications, the dose of one or both agents should be significantly reduced. Despite this warning, Dr. Sanders prescribed the Patches to Decedent without reducing the dose of Decedent's other CNS-depressing medications and quadrupled Decedent's fentanyl dose in a short period of time. This was a breach of the standard of care and significantly increased Decedent's risk of respiratory depression.

20. The Package Insert for the Patches contains black box warning doctors about the risk of fatal overdose from abuse or misuse of the Patches. The insert warns that doctors should consider the risk of abuse when deciding whether to prescribe fentanyl for a patient. The insert warns:

> Fentanyl transdermal system can be abused in a similar manner to other opioid agonists, legal or illicit. This risk should be considered when administering, prescribing, or dispensing fentanyl transdermal system in situations where the healthcare provider is concerned about the risk of misuse, abuse, or diversion. Persons at increased risk for opioid risk include those with a personal or family history of substance abuse (including drug or alcohol abuse or addiction) or mental illness (e.g., major depression). Patients should be assessed for their clinical risks for opioid abuse or addiction prior to being prescribed opioids. All patients receiving opioids should be routinely monitored for signs of misuse, abuse, and addiction.

21. Dr. Sanders knew or should have known that Decedent had numerous risk factors for opioid abuse, including, without limitation:

    a. A known suicide attempt via prescription overdose in 2006;

    b. A family history of alcoholism;

    c. Depression that Dr. Sanders characterized as "major and severe";

    d. Drug seeking behavior while a patient of Dr. Sanders;

    e. Frequent requests for early refills of medications, including clonazepam;

  f. Frequent instances of getting narcotic medications by going to the emergency room;

  g. Frequent requests for additional and higher doses of narcotic medications;

  h. An instance in which the Decedent went to the emergency room in October 2009 and was slurring her words due to what Dr. Sanders believed to be overmedication; and

  i. An instance in which Decedent obtained narcotic pain medications from a friend (Dr. Sanders was aware of this fact, but he made light of it and continued to prescribe narcotics for Decedent at ever increasing doses).

  j. Lack of compliance with opioid treatment agreement such as re-evaluation every 30 days.

22. All of the above-described risk factors for opioid abuse were documented in Dr. Sanders's chart. In many cases, the medical records indicate that Dr. Sanders recognized that these were signs of opioid abuse. But Dr. Sanders ignored these risk factors and continued to prescribe narcotics and other CNS depressants for Decedent at higher and higher doses. This was a breach of the standard of care and it significantly increased Decedent's risk of fatal respiratory depression. To the extent he released medications early such as Fentanyl, or the patient made requests for early refills such as clonazepam; both circumstances suggest unstable and dangerous dosing levels. Continuing the medications in the context of these warning signs, at increased levels, resulted in death.

23. Decedent died on January 22, 2010 of a mixed drug overdose, which was caused by the fentanyl and other sedating drugs prescribed by Dr. Sanders. If Dr. Sanders had not prescribed a high dose of fentanyl and other CNS depressants for Decedent, she would not have died.

24. The multiple breaches in the standard of care by Dr. Sanders were the proximate cause of Decedent's death and the damages claimed in this case. Decedent's death was the

proximate cause of one or more of the following breaches of the standard of care by Dr. Sanders: (a) prescribing an excessive dose of fentanyl; (b) significantly increasing Decedent's fentanyl dose when she was experiencing acute pain; (c) prescribing a high dose of fentanyl with numerous other CNS depressants; (d) prescribing fentanyl to a patient who was predisposed to hypoventilation; and/or (e) prescribing fentanyl and other sedating medications to a patient with numerous known risk factors for abusing the medication, (f) failing to take appropriate action to transition the patient away from danger, in the face of obvious signs of abuse, multiple risk factors, and sustained aberrant medication behaviors.

## CAUSES OF ACTION

### COUNT I
### PROFESSIONAL NEGLIGENCE

25.     Defendants Dr. Sanders and Attleboro Internal Medicine, P.C. breached the duty to provide reasonable care when they negligently departed from the appropriate medical and professional standards in the course of Decedent's treatment.

26.     Defendants' breaches in the standard of care including, without limitation:

   a.   Prescribing an excessive dose of fentanyl for Decedent;

   b.   Significantly increasing Decedent's fentanyl dose when she was experiencing acute pain;

   c.   Prescribing a high dose of fentanyl with numerous other CNS depressants concominantly for Decedent;

   d.   Prescribing fentanyl to a patient who was predisposed to hypoventilation;

   e.   Prescribing fentanyl and other sedating medications to a patient with numerous known risk factors for abusing or misusing the medication;

   f.   Failing to adequately warn Decedent about the risks associated with the dose and combination of fentanyl and other CNS depressants that were prescribed for Decedent; and

    g.  In failing to act as a reasonable and prudent physician under the same or similar circumstances.

  27.  The conduct of Dr. Sanders and Attleboro Internal Medicine, P.C., as described herein, constituted a serious breach of the standard of care owed by them to Decedent. That constitutes professional negligence and was the proximate cause and/or a substantial factor in causing Decedent's death and the damages claimed herein.

## COUNT II
## LOSS OF COMPANIONSHIP AND SOCIETY

28.     As a consequence of Defendants' actions and inactions as set forth above, Plaintiff and the other wrongful death beneficiaries (Decedent's spouse and children) have been caused to suffer a loss of the companionship, society, and consortium of Decedent due to her death.

29.     Plaintiff and the other wrongful death beneficiaries have been damaged thereby.

### WILLFUL, WANTON, AND RECKLESS CONDUCT

30.     The conduct of the Defendants as described herein was malicious, willful, wanton or reckless or was grossly negligent.

31.     Such conduct was the direct and proximate cause of or substantially contributed to Decedent's death.

### REQUEST FOR RELIEF

**WHEREFORE**, the Plaintiff Michael Gignac ("Plaintiff"), individually and as Personal Representative of the Estate of Laurie Ann Gignac respectfully prays that:

   a.   judgment be entered against the defendants, Christopher Sanders, M.D. and Attleboro Internal Medicine, P.C. jointly and severally on all counts of this Complaint;

   b.   the plaintiff be awarded on behalf of the heirs-at-law of Laurie Ann Gignac full, fair and complete compensation under M.G.L. c. 229, § 2 for Decedent's wrongful death and the economic and intangible injuries resulting therefrom to the heirs-at-law;

   c.   the plaintiff be awarded on behalf of the Estate of Laurie Ann Gignac full, fair and complete compensation under M.G.L. c. 229, § 6 for decedent's conscious pain and suffering;

   d.   the plaintiff be awarded appropriate, independent and substantial punitive damages against the defendants as a consequence of their gross negligence which proximately caused or substantially contributed to the death of Laurie Ann Gignac;

e.       the plaintiff be awarded, on behalf of each heir-at-law, full compensation for the loss of companionship and society suffered by the said heirs;

f.       the plaintiff be awarded all appropriate costs, attorneys' fees, expenses and pre and post judgment interest authorized by law on the judgments which enter in his behalf; and

g.       the Court enter such other relief as is deemed just and appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.

                                MICHAEL GIGNAC, as he is the duly appointed Personal Representative of the Estate of LAURIE ANN GIGNAC, by his attorneys,

                                _/s/ *Michael D. Lurie*_____
                                Michael Lurie, BBO # 553024
                                mlurie@mrelegal.com
                                **MacDonald Rothweiler Eisenberg LLP**
                                One Bowdoin Square
                                Boston, MA 02114
                                617-747-7550 (phone)
                                617-747-7551 (fax)

Of counsel:

James Craig Orr, Jr.,
Texas Bar No. 15313550
Michael E. Heygood,
State Bar No. 00784267
Eric D. Pearson,
State Bar No. 15690472
Charles W. Miller,
Texas Bar No. 24007677
**Heygood, Orr & Pearson**
2331 W. Northwest Highway, 2nd Floor
Dallas, TX 75220
214-237-9001 (office)
214-237-9002 (fax)